IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2021

## STATE OF TENNESSEE v. TIMOTHY WHITAKER

**Appeal from the Criminal Court for Knox County**
**No. 109595   Steven Wayne Sword, Judge**

_____

### No. E2021-00456-CCA-R3-CD
_____

Defendant, Timothy Whitaker, was convicted following a jury trial of attempted second-degree murder, two counts of aggravated assault by use of a deadly weapon, two counts of aggravated assault with serious bodily injury, and misdemeanor reckless endangerment. The trial court sentenced Defendant to an effective sentence of fourteen years. On appeal, Defendant argues that the evidence was insufficient to support his conviction for attempted second-degree murder and that the trial court abused its discretion in ordering partially consecutive sentences. Following our review of the entire record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Timothy A. Whitaker.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

This case arises from the assaults of two employees of Beardsley Community Farm ("the farm") on November 8, 2016, in Knoxville, Tennessee. The first victim, Ms. Yar Khan Chov was the director of urban agriculture and, the second victim, Mr. Adam Caraco

was the assistant director of agriculture at the farm. Defendant became a volunteer with the farm in 2012, and after a few years, Ms. Chov hired Defendant as a part-time urban agriculture assistant.

*The State's Proof at Trial*

Russ Whitfield, a forensic technician with the Knoxville Police Department testified that he photographed the aftermath of the attack at the farm on November 8, 2016. The photos taken by Mr. Whitfield were admitted into evidence and depicted the injuries of both victims, the scene of the offense, the tools used in the attack and the condition of Defendant immediately following the offense. After taking photographs at the crime scene, Mr. Whitfield traveled to the hospital to photograph the injuries of the victims and the condition of Defendant. On cross-examination, Mr. Whitfield agreed that there was not a wound on the back of Ms. Chov's neck or shoulders when he photographed her on the day of the offense. Mr. Whitfield further agreed that the photographs he took did not depict blood left on the ground at the scene. On redirect examination, Mr. Whitfield clarified that the photographs he took would not show internal injuries sustained by either of the victims.

Kellie Hill testified that she served with AmeriCorps as a full-time volunteer. Ms. Hill testified that AmeriCorps is a national service program that works with different nonprofits and that the farm began in 1998 to address the issue of food insecurity. She testified that she had been a volunteer at the farm since the summer of 2016. The farm's mission was to increase access to food through community gardening and donating food to other non-profit organizations. The farm also hosted interns and volunteers to teach them about nutrition and the environment. At the farm, Ms. Hill worked as the environmental educator. Ms. Hill explained the day-to-day activities on the farm which began with a morning meeting to delegate tasks which varied from day to day. Ms. Hill testified that her relationship with Defendant was "strictly" work-related. She testified that Defendant was hostile and liked to debate, especially in the days leading up to the election in November 2016. In October or early November 2016, Ms. Hill expressed concern about Defendant with Khan Chov, telling her that Defendant made Ms. Hill feel uncomfortable and that conversations with him made her feel "belittled." Ms. Hill testified that she was at work on November 7, 2016, and recalled that Defendant was "not in a good mood" on that day.

Ms. Hill testified that on November 8, 2016, the day began with the morning meeting at the farm which Defendant did not attend. When Defendant arrived and Ms. Chov greeted him, he walked away without responding. According to Ms. Hill, Defendant walked out to the barn and began pushing the bush hog by himself. Usually, more than one person is required to move the bush hog and raise it up on two benches to be repaired. Ms. Hill heard Adam Caraco say to Ms. Chov, "[Defendant is] trying to work on the bush

hog first thing. Like, let's go out there and try to help him." Ms. Hill followed Ms. Chov and Mr. Caraco out of the building to the pavilion as they were offering help to Defendant. Ms. Hill recalled that she was walking along the greenhouse when she began to hear Defendant "screaming" at Ms. Chov. Ms. Hill testified that Defendant began yelling profanities at Ms. Chov and that Ms. Hill was "terrified" and "afraid for [her] life." Ms. Hill heard Ms. Chov try to calm Defendant by talking to him, but Defendant continued yelling. According to Ms. Hill's testimony, Defendant cursed Ms. Kahn and "was just yelling really terrifying things." Ms. Hill called 9-1-1. As she was on the phone speaking to emergency services, she observed Defendant retreat to the barn, so she hung up because she believed that the situation was diffusing.

Ms. Hill testified that at some point, she went inside the education center and continued to watch the encounter among Defendant, Ms. Chov and Mr. Caraco through a window. While she was inside the education center with Jenna Bailey, another volunteer, Ms. Hill locked the doors to the building. Ms. Hill testified that she observed Defendant return from the barn with two hand mattocks[1], and she watched as Defendant "aggressively" hit one of the mattocks into a wooden picnic table. Ms. Hill then saw Defendant retrieve the mattock he had thrown into the picnic table, so that he wielded a mattock in each hand. At this point, Ms. Hill called 9-1-1 again. Ms. Hill testified that she watched as Ms. Chov began walking towards the parking lot, and Defendant "chase[d] Khan across the parking lot with the hand mattocks, like, raised, 'cause he was gonna hit her with it, and the he hit Khan, like, in her head, but she, like, blocked it with her hand, and then [Ms. Hill] just saw her on the ground, and she wasn't moving."

Ms. Hill observed Mr. Caraco grab Defendant from the back in an attempt to pull Defendant away from Ms. Chov. At some point during the struggle with Mr. Caraco, Ms. Hill observed that Defendant dropped one of the hand mattocks while he continued to swing the other at Mr. Caraco. Ms. Hill testified that Ms. Bailey ran out of the education center to grab the hand mattock that had fallen while Mr. Caraco and Defendant continued to struggle. Throughout Ms. Hill's observation, she remained on the phone with emergency services. During the struggle, Ms. Hill noticed that Mr. Caraco was bleeding from his head and that there was "a huge gash on [Mr. Caraco]'s face." Ms. Hill testified that while Mr. Caraco and Defendant were locked together, struggling on the ground, emergency services and police arrived to the farm. On cross-examination, Ms. Hill agreed that she had never heard Defendant verbally threaten anyone. Ms. Hill also agreed that her original statement to prosecutor's did not include her observation of Defendant hitting Ms. Chov; however, Ms. Hill maintained that her testimony was correct on the day of trial, that she did observe Defendant hit Ms. Chov.

---

[1] A hand mattock is a tool used for digging, prying or chopping. It has a long handle with a round head at the top, adjoining a vertical axe blade to a horizontal adze; it is similar to a pickaxe.

Barbara Kelly testified that she was the Executive Director of the Knox County Community Action Committee and that she supervised staff and oversaw various programs including Beardsley Farm. Ms. Kelly testified that on November 8, 2016, she was working in her office when she received a phone call from Ms. Chov who was screaming. In response, Ms. Kelly hung up the phone and called for help, then she immediately went to the farm where she observed Defendant lying on the ground and handcuffed. Ms. Kelly testified that she saw Mr. Caraco bleeding from his head and Ms. Chov crying and screaming with blood on her hands. Ms. Kelly testified that she saw the picnic bench Defendant struck with the mattock and saw the gouge in the wood. On cross-examination, Ms. Kelly testified that she did not have much contact with Defendant.

Yar Khan Chov testified that, at the time of the trial, she had worked at the farm for ten years. Ms. Chov began as the fam's manager and was eventually promoted to Urban Agriculture Director. Ms. Chov explained that throughout the course of each year, nearly 1,300 unduplicated volunteers work at the farm. Ms. Chov testified that in November 2016, there were four staff members, including Defendant plus two AmeriCorps volunteers working at the farm. Defendant's title was Urban Agriculture Assistant, and he assisted with projects on the farm. Ms. Chov described Defendant as skilled at building and at trouble-shooting and said that he was efficient. Ms. Chov also testified that she often bragged about how strong Defendant was and that after knowing him for a while as a volunteer, she hired him. Ms. Chov described her relationship with Defendant as "friends." She explained that Defendant was not very talkative but they talked about work and that he was reliable and dependable for the farm. Overall, Ms. Chov described her relationship with Defendant as "cordial" prior to November 8, 2016.

Ms. Chov testified that she discussed the concerns of the staff and volunteers on the farm with Kellie Hill, Jenna Bailey and Charlotte Rodina. Ms. Chov testified that in response to the concerns about Defendant that were raised to her, she advised Ms. Hill, Ms. Bailey and Ms. Rodina to avoid uncomfortable conversation topics. Ms. Chov decided that Mr. Caraco should be involved in the conversation with Defendant because "[Defendant] and [Mr. Caraco] were closer," and she thought Defendant felt comfortable around Mr. Caraco. Mr. Caraco and Ms. Chov approached Defendant to take a walk around the farm with them, and asked him to leave "uncomfortable topics off the table." Ms. Chov testified that she and Mr. Caraco also encouraged Defendant to find places outside of work, such as church groups, to have those discussions. Ms. Chov believed that the situation had been resolved following the conversation she and Mr. Caraco had with Defendant, that Defendant had listened to her request and that he had expressed appreciation that he was able to talk with Ms. Chov and Mr. Caraco.

- 4 -

On November 7, 2016, Ms. Chov recalled that Mr. Caraco had warned her that Defendant was angry and that she should stay away from him. Ms. Chov testified that she tried to give Defendant space and that he left the farm early that day. The next day, November 8, 2016, Ms. Chov testified that she arrived at the farm and began to prepare for the morning meeting. She recalled Mr. Caraco's arriving, and when Defendant arrived, Ms. Chov greeted him, but Defendant did not respond. Ms. Chov explained that Defendant walked out of the building toward the barn and that she heard him begin to struggle with the bush hog. According to Ms. Chov's testimony, she and Mr. Caraco went outside to try to set up the benches so that the bush hog could be placed on top of them for repairs to be made. Ms. Chov testified that she and Mr. Caraco barely touched the benches before Defendant picked the bench up over his shoulder and slammed it on the ground. Defendant then began screaming at Ms. Chov, "Damn you." Ms. Chov testified that she was scared and that her heart was racing. She asked Defendant, "What did I do? Why me? What did I do?" Ms. Chov continued to attempt to talk calmly with Defendant but he could not be consoled. Ms. Chov testified that she watched Defendant walk into the barn and return with two hand mattocks, then he threw one of the mattocks into the picnic table. Ms. Chov explained that she began to walk towards the parking lot and that Defendant chased after her. Ms. Chov testified, "I was just cowering, and—and he struck me in the head. My arm—my reflexes got in the way, thankfully. Had I not had my arm up, I do feel like I would have had a blow to the head with a mattock. . . ." Ms. Chov then fell to the ground and "blacked out." Ms. Chov regained consciousness and was able to stand up off the ground, at which point, she observed Mr. Caraco bleeding from his head, yelling "9-1-1." Ms. Chov testified that she ran into the building and screamed, "Call 9-1-1." Ms. Chov then called Ms. Kelly.

Ms. Chov testified that she sustained a skull fracture at the base of her skull and the fifth vertebra down, as well as fractures in her hand as a result of the attack. She testified that she could not move her hands, neck or head for six weeks and that she could not drive. She required physical therapy and had to have someone with her constantly for two months after the attack. Ms. Chov had to wear a cervical collar, and she did not return to work for a month. Ms. Chov testified that she also sought psychological counseling following the attack because she was experiencing stress and nightmares. On cross-examination, Ms. Chov acknowledged that she had never heard Defendant physically threaten anyone. Ms. Chov also conceded that she did not see Defendant strike her because she was cowered "in fear of [her] life." Ms. Chov also explained on cross-examination that Defendant typically enjoyed, and "took pride" in, working on projects alone. She also testified that political conversations were not frequent on the farm, but that the rule against discussing controversial topics was necessary to avoid disturbances during work.

Adam Caraco testified that he began working at the farm in 2008 as a volunteer for AmeriCorps, then eventually became a full-time staff member in 2015. Mr. Caraco

described his relationship with Defendant as being "good friends." He explained that he and Defendant played chess together on lunch breaks, went for bike rides and that Defendant visited Mr. Caraco's home for dinner "countless times." Mr. Caraco testified that Defendant helped him with projects around his home and that Defendant was present at Mr. Caraco's wedding, and even helped to set up the wedding ceremony. Mr. Caraco recalled that Defendant often expressed feeling isolated, so Mr. Caraco offered to go to church with Defendant. Mr. Caraco explained that he would "do anything for any of [his] friends." When Defendant needed to travel farther than where he could ride on his bicycle, Mr. Caraco would give him a ride and when Defendant lost the keys to his home, he stayed at Mr. Caraco's home. Mr. Caraco saw Defendant outside of work for social activities, and Mr. Caraco introduced Defendant to his friends. Mr. Caraco testified that during one day at work, Mr. Caraco asked Defendant, "Hey, if this was a zombie apocalypse, what weapons would you go for, the two hand mattocks?" To which Defendant replied, "Every time."

Mr. Caraco was happy to talk with Defendant regarding the concerns raised to Ms. Chov by other staff members and felt comfortable talking with Defendant. Mr. Caraco testified that he and Ms. Chov intentionally approached Defendant when he was not with other people so that Defendant would not feel like he was being "taken aside." Mr. Caraco recalled that Defendant was withdrawn and quiet during the conversation and that Defendant said, "You guys have people to go home and talk to. If I don't talk here, I don't talk anywhere[ ]." Mr. Caraco responded that Defendant was welcome to talk to him, just not around the volunteers when the conversation was on a controversial topic. Mr. Caraco believed that even when he and Defendant disagreed, they mutually respected each other.

On November 8, 2016, Mr. Caraco explained that he rode his bike to work that morning and saw Defendant as he was coming down the driveway to the farm. "[Defendant] was walking in. I have fun. Like that's what I do. I remember I made a silly noise, like a crow, and he just glared at me." When Defendant arrived to work, Mr. Caraco recalled that he did not respond to greetings directed at him, and then he went out of the building toward the bush hog. Mr. Caraco testified that he heard Defendant struggling with the bush hog and that he and Ms. Chov went outside to help Defendant. Mr. Caraco said that he told Defendant that he would help with the bush hog, and Defendant began yelling profanities, and Ms. Chov began talking to Defendant, asking, "What did we do?" Mr. Caraco testified that he told Defendant, "You can talk to us . . . I know you're a little stressed." Defendant responded, "You haven't seen stress yet. I'm just blowing off a little steam." Mr. Caraco then observed Defendant walk to the barn and return with two hand mattocks.

Mr. Caraco testified that at some point, Defendant had picked the bench up over his shoulder and slammed it down, and when Defendant returned from the barn, he threw one

of the mattocks into the picnic table, cutting a chunk of wood out of the table. Mr. Caraco then testified that Defendant picked the mattock back up from the picnic table and chased down Ms. Chov as she ran away and struck her once with a mattock. Mr. Caraco testified that he thought that Defendant had killed Ms. Chov. Mr. Caraco testified that he could not tell if Defendant had hit Ms. Chov in the face or in the hand, and later testified that Defendant "swung a mattock at her head. Of course her life was in danger. He hit her once, and he had a mattock up in the air about to hit her again." Mr. Caraco didn't remember running toward Defendant but at some point was "face to face with him." Mr. Caraco explained that Defendant had a mattock in each hand and that during the struggle, Mr. Caraco was hit in the head with a mattock. Mr. Caraco and Defendant ended up on the ground as Mr. Caraco tried to grab Defendant's hands. Mr. Caraco was able to restrain Defendant until emergency personnel arrived.

Mr. Caraco testified that he suffered a subarachnoid hemorrhage as a result of the attack and that he had terrible pain the day after the attack that resulted in his having to be re-admitted to the hospital for treatment. Mr. Caraco lost the ability to spell temporarily; he slept almost constantly during his recovery and experienced symptoms similar to depression. Mr. Caraco testified that he could barely get out of bed to do small tasks or to take care of his basic hygiene needs. Mr. Caraco did not return to work until February, at which point, he was still experiencing daily headaches. Mr. Caraco also explained that he suffered from nightmares. Mr. Caraco's thumb sustained a deranged ligament from the struggle with Defendant. Mr. Caraco continued to go to physical therapy for several months, and a lump on his scalp resulting from his injuries was still visible at the time of Defendant's trial.

*Defendant's Proof at Trial*

Defendant testified that he moved to Tennessee after going through a difficult divorce in Florida. After moving to Knoxville in 2012, Defendant began volunteering at the farm within a couple of months. Defendant testified that he liked the farm's mission to provide food for donation, and he explained the various tasks he assisted with on the farm. Defendant felt productive on the farm and enjoyed the management at the farm. Defendant explained that during his time volunteering, his brother supported him financially and he often received food in exchange for his work on the farm. Defendant recalled that he was hired at the farm after a few years of volunteering. Defendant agreed with Mr. Caraco's testimony that they became close friends through working on the farm. Defendant also conceded that he had suggested that he would use the hand mattocks as weapon in the event of "World War Z" or a zombie attack.

Defendant believed that his relationships with his co-workers on the farm were "pretty good" and recalled that he only began having trouble with his co-workers when the

younger AmeriCorps volunteers began in the summer of 2016. Defendant believed that he was in the political minority at the farm and felt as though discussions about politics occurred naturally around the election in November 2016. Defendant testified that in these conversations, he felt like "a lone Indian" and expressed that he felt as though the volunteers "crowded around [him]" when they disagreed with him. Defendant recalled an incident after an elementary school field trip at the farm. Defendant explained that he knew the children from having volunteered at the school, so when one of the children ran around and was not paying attention, Defendant stopped the child and said, "Hey, hey, we—we don't do that in here." Defendant testified that Ms. Bailey disagreed with his having touched the child when he stopped the child from running. Ms. Bailey admonished Defendant with Ms. Rodina and Ms. Chov. Defendant disagreed with the characterization that the AmeriCorps volunteers felt threatened by him, and explained that they had "gotten into [his] face and crowded around [him]" so he did not know why they would feel threatened by him. Defendant explained that after his conversation with Ms. Chov and Mr. Caraco about not discussing uncomfortable topics at work, he understood. He testified that initially he thought "Well, we're really not here to discuss politics or religion . . . you're right." However, Defendant began to feel isolated and felt as though he didn't have anyone outside of his friends at work with whom to have conversations. Defendant began to feel as though he was being excluded from the groups at work.

On November 7, 2016, Defendant testified that things on the farm were very busy and that he was feeling frustrated and "bottled up" and angry. Defendant worked throughout the morning but testified that he chose to leave work that day soon after lunch when he felt ostracized by his co-workers during lunch. On November 8, 2016, Defendant testified that he almost did not go to work because he had not slept well and was feeling frustrated. However, Defendant decided to go to work despite his "blue mood," and he encountered Mr. Caraco on his way to work, when Mr. Caraco made a "coo-coo noise" at Defendant. Defendant testified that when he arrived at work, he went straight out to the pavilion to work on the bush hog. He saw Mr. Caraco and Ms. Chov walking toward him as he was moving the benches, and he just wanted to be left alone because he was feeling frustrated and angry. Defendant testified that he believed that he was being kicked off the farm and that when Ms. Chov and Mr. Caraco reached him in the pavilion, he began yelling, "Damn you." Defendant explained that he has trouble verbalizing when he is angry and that it frustrated him when Mr. Caraco and Ms. Chov offered to talk with him because he had been admonished not to talk at work. Defendant acknowledged that he went to the barn and returned to the pavilion with the hand mattocks to go cut down weeds. When he returned, Defendant testified that he remembered Ms. Chov saying, "What are you doing with the picnic—or the mattocks, and you're scaring us," which frustrated Defendant. Defendant testified that he threw the mattock at the picnic table and Ms. Chov said, "We're—we're not gonna—we're not gonna let you destroy those picnic tables." Defendant testified that he felt as though he was being valued as less than the picnic tables.

Defendant testified that Ms. Chov began to walk away from him but that she turned around and began to say something to him, which caused him to "[see] red" as he ran towards her and hit her with one of the mattocks. Defendant testified that he was aiming for Ms. Chov's hand. He recalled that Ms. Chov did not have her hand over her face and testified that her hand was at her chest or near her shoulder but insisted that her hand was not over her head. Defendant testified that Ms. Chov then began running away and that he ran after her because he wanted her to "stay away." Defendant testified that he was not trying to kill Ms. Chov. Defendant testified that Ms. Chov fell forward while she was running and that he believed that she had blacked out. Defendant remembered pumping the mattocks once or twice in the air before seeing Mr. Caraco running towards him. Defendant explained that he turned towards Mr. Caraco and then was hit by Mr. Caraco running at him. Defendant did not recall how Mr. Caraco was hit by one of the mattocks in the head, but he believed that it happened when his hand swung to the side during the struggle. Defendant testified that he did not intend to hurt Mr. Caraco and explained that eventually Mr. Caraco got him into a chokehold, so he stopped struggling and ended up dropping the mattock in his right hand, while maintaining control of the mattock in his left hand, although he had stopped swinging it.

Defendant reiterated that he did not intend to kill either Ms. Chov or Mr. Caraco. On cross-examination, Defendant agreed that Ms. Chov was smaller than him and that she was unarmed on the day of the offense. He conceded that he was not acting in self-defense when he hit her. Defendant agreed that he knew that mattocks were dangerous and that one could be used as a weapon. Defendant testified that he believed that Mr. Caraco and Ms. Chov were lying during their testimony, or at the very least, exaggerating what had occurred.

Following the attack, Defendant was indicted on the following six counts: Count 1 attempted first-degree premeditated murder as to Adam Caraco; Count 2 attempted first-degree premeditated murder as to Yar Khan Chov; Count 3 aggravated assault by use of a deadly weapon as to Adam Caraco; Count 4 aggravated assault with serious bodily injury as to Adam Caraco; Count 5 aggravated assault by use of a deadly weapon as to Yar Khan Chov; and Count 6 aggravated assault with serious bodily injury as to Yar Khan Chov. Based on the foregoing evidence, the jury convicted Defendant of reckless endangerment in Count 1, attempted second-degree murder in Count 2, and aggravated assault in Counts 3, 4, 5 and 6.

*Sentencing Hearing*

Defendant's presentence investigation report was exhibited to the hearing and indicated that he had no prior criminal record. Ms. Chov's victim impact statement was

also admitted into evidence. She described being scared for her life and further detailed the injuries to her head and hands. Mr. Caraco testified at the sentencing hearing and described the severity of his brain injury and hand injuries. Mr. Caraco further testified that Defendant told him that after Defendant's divorce he had seriously considered killing his father-in-law and that his siblings had talked him out of his plan to do so. Mr. Caraco also recalled an occasion when Defendant offered to fight a man who had been aggressive toward Ms. Chov.

Defendant testified that he held no grudges against either of the victims and that he still considered each of them to be his friends. Defendant testified that he was not motivated by hatred toward the victims. He believed that the attack had been a "bad situation" and that he just "blew up" and "lost it."

In sentencing Defendant, the trial court indicated that it had considered the evidence presented at trial and at the sentencing hearing, the victim impact reports, the presentence investigation report, the results of the Strong-R assessment, the principles and purposes of sentencing, arguments of counsel, and the nature and circumstances of the offense. The trial court found that Defendant was a Range I Standard Offender.

As the thirteenth juror, the trial court found that although no expert medical testimony was offered, the medical records and the testimony from each of the victims regarding their injuries were sufficient to support the jury's finding of serious bodily injury in Counts 4 and 6. Regarding the aggravated assault counts, the trial court merged Count 4 into Count 3, and Count 6 into Count 5. The trial court considered enhancement and mitigating factors and applied Enhancement Factor 6 to Counts 2, 3 and 5; Enhancement Factor 9 to Counts 2, 4 and 6; and Mitigating Factor 1 to all counts.

The trial court then considered whether the sentences on each count should run concurrently or consecutively. The trial court applied the *Wilkerson* factors in analyzing whether Defendant's behavior indicated little to no regard for human life and whether he had shown no hesitation about committing a crime in which the risk to human life was high. *See State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). The trial court found that the circumstances of the offense were aggravated in that Defendant was treated with kindness by his co-workers at the farm, that the staff was trying to make the environment healthy for everyone who worked on the farm, that they approached Defendant "with as much grace as they could and still protect the other folks who worked there at the farm," and Defendant's response was one of "extreme rage." The court further noted that in response to Defendant's rage, the victims did not express their own rage but tried to "de-escalate" the situation and attempted to help Defendant calm down. The trial court credited Defendant's testimony at the sentencing hearing that he had "just blown up" but explained that it found that it was "a sustained blowing up" in which Defendant had intentionally

gone to retrieve a weapon, then returned and struck the picnic table in a "very scary and threatening manner" towards the victims. The trial court further noted that when Ms. Chov retreated and attempted to get away from Defendant in the midst of his anger, Defendant chased her down. The trial court accredited Ms. Chov's testimony that Defendant was trying to strike her in the head over Defendant's testimony that he tried to hit her hand. The trial court further found that Mr. Caraco tried to save Ms. Chov at the risk of his own life and that Defendant "still did not calm down as Mr. Caraco was trying to talk to him while he's wrestling with him, and [Defendant's] response was is to--to reach behind him and continue to swing the mattock, and then caused injury to Mr. Caraco's head."

The trial court found that based upon the circumstances of the attack and Defendant's discussions about considering violence in the past, an extended sentence was necessary to protect society from Defendant. The court further considered whether the aggregate length of the sentence was reasonably related to the offense for which Defendant was convicted and found that the aggregate length of the sentence was reasonably related to each of the offenses of which Defendant was convicted. The trial court found that looking at the totality of the circumstances, Defendant is a dangerous offender, that his behavior indicated little to no regard for human life and that Defendant did not hesitate when committing crimes when the risk to human life was high. Consequently, the trial court found that partially consecutive sentencing was warranted and ordered Defendant to serve ten years for Count 2; four years each for merged Counts 3 and 4 to run consecutively with Count 2; four years for merged Counts 5 and 6 to run concurrently with Count 2; and eleven months and twenty-nine days for Count 1 to run concurrently with Count 2 for a total effective sentence of fourteen years. Defendant received credit for 871 days in custody.

## Analysis

On appeal, Defendant argues that the evidence was insufficient to uphold his conviction for attempted second-degree murder of Ms. Chov and that the trial court erred in ordering partially consecutive sentencing. Defendant specifically argues that the evidence did not support a finding that he intended to cause the death of either victim. Further, Defendant contends that the court erred in finding him to be a dangerous offender for purposes of ordering consecutive sentencing. The State maintains that the evidence was sufficient to uphold Defendant's conviction for attempted second-degree murder and that the trial court did not err in ordering a less-than-maximum partially consecutive sentence. We agree with the State.

*Sufficiency of the Evidence*

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins,* 102 S.W.3d 578, 581 (Tenn. 2003). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan,* 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews,* 805 S.W.2d at 779. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett,* 788 S.W.2d 559, 561 (Tenn. 1990).

Second-degree murder is a knowing killing of another. T.C.A. § 30-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-106(22). Criminal attempt is defined as follows:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> . . .
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]

T.C.A. § 39-12-101(a).

Here, the record clearly reflects that Defendant arrived at the farm visibly upset on the morning of the offense. He skipped the morning meeting with his co-workers and walked past the pavilion to the barn where he attempted to move the bush hog by himself. In an effort to assist, Ms. Chov and Mr. Caraco followed him and began to move a bench on the pavilion where the bush hog would be placed for repairs. Defendant yelled and cursed at both victims who made repeated attempts to calm him. Defendant retreated to the barn, came out with two hand mattocks, returned to the pavilion where Ms. Chov and Mr. Caraco were standing, and he threw one of the mattocks aggressively into a bench.

When efforts to calm Defendant were unsuccessful, Ms. Chov attempted to walk away, and in fact ran toward the parking lot. Defendant chased after Ms. Chov while wielding a mattock in each hand, caught up with her and swung a mattock at her head, striking her. Ms. Chov lost consciousness and fell to the ground. Mr. Caraco ran to Ms. Chov's defense and struggled with Defendant in an attempt to disarm him while Defendant continued to wield the mattocks and swing them above his head. During the struggle, Defendant hit Mr. Caraco in the head with one of the mattocks. Both victims suffered severe injuries that required hospitalization, months of recovery, physical therapy and psychological counseling. From this evidence, the jury could reasonably conclude that Defendant knowingly swung the mattock at Ms. Chov believing that it could kill her.

Defendant argues specifically that the evidence did not prove beyond a reasonable doubt that he had either the intent to kill Ms. Chov or the motive to do so. However, his argument misunderstands the requisite mental state for a conviction of attempted second-degree murder. Motive is not an element of the offense; therefore, the State was not required to prove that Defendant had a motive to attempt to kill Ms. Chov. Furthermore, Defendant's argument seems to suggest that the State was required to prove that he intentionally or purposefully attempted to kill Ms. Chov; however, Defendant's conviction for attempted second-degree murder requires only that Defendant acted knowingly. Whether a defendant acted "knowingly" in killing another is a question of fact for the jury's determination. *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Based on the evidence presented at trial, a reasonable jury could have concluded beyond a reasonable doubt that Defendant attempted a knowing killing of Ms. Chov. The jury accredited Ms. Chov's testimony over that of Defendant. This court will not displace the jury's credibility and weight determinations with its own. Defendant is not entitled to relief on this claim.

*Sentencing*

When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determinations under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "This abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing." *State v. Caudle*, 388 S.W.3d 273, 278 (Tenn. 2012). *See also State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013) (standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness). A finding of abuse of discretion indicates the "trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001). A trial court has not abused its discretion unless "the record [is] void of any substantial evidence that would support the trial court's decision." *Id*.

In making sentencing decisions, trial courts must consider the following: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the conduct involved; (5) evidence and information offered by the parties regarding the statutory mitigation and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make on his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b).

Tennessee Code Annotated section 40-35-115(b) sets forth the criteria the court shall consider in ordering sentences to run consecutively or concurrently:

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115(b)(4). *See also Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976). A defendant may be classified as a dangerous offender if the crimes for which he is convicted indicate that he has little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *Id. See also* T.C.A. § 40-35-115(b)(4). The decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed. *Id.* To impose consecutive sentencing based on a finding that the defendant is a dangerous offender, the court must also find that "an extended sentence is necessary to protect against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). The trial court must also make specific findings about "particular facts" that support the *Wilkerson* factors. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (citing *Wilkerson*, 905 S.W.2d at 939). So long as the trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal. *Pollard*, 432 S.W.3d at 862.

As set out above, the trial court articulated its reasons for consecutive sentencing and sentenced Defendant to within-range sentences that reflect the purposes and principles of the Sentencing Act. The trial court did not abuse its discretion by finding that Defendant was a dangerous offender whose actions indicated little to no regard for human life and that he expressed no hesitation about committing a crime in which the risk to human life was high. The trial court made the requisite *Wilkerson* findings, and concluded that the circumstances of the offense were aggravated, that confinement for an extended period of time was necessary to protect society from further criminal activity from Defendant, and that the aggregate sentence reasonably related to the seriousness of the offenses.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JILL BARTEE AYERS, JUDGE